Spear, C. J.
A determination of the questions raised upon the record by the exceptions of the defendant below, makes it necessary -to consider sections 2573 and 2574, Revised Statutes, relating to the providing of exits from buildings. As enacted April 19, 1883, these sections are as follows.
“SECTION 2573. It shall be the duty of any owner or agerit for' owner of any factory, workshop, tenement house, inn, or public house, if such factory, workshop, tenement house, inn, or public house be more than two stories high, to provide a convenient exit from the different upper stories ■of said building, which shall be easily accessible in case of fire, and any owner or person having control of any such inn or public house where travelers or boarders are lodged in any story above the second story of the building, shall .also provide a good rope or other life-line for each sleeping-room for guests in such stories.
“Section 2574. It shall be the duty of the mayor of each city or village to require the owner or agent for owner of .any factory, workshop, tenement house, or inn or public house, within the meaning of the next preceding section, to comply with the requirements of said section within sixty days from the serving of a notice by the mayor so to do, unless such owner or agent for owner shall have previously complied with the requirements of said preceding section, and if, any such owner or agent of owner neglects or refuses to comply with the requirements of the next preceeding section, within the time specified in said notice, he shall forfeit not less than fifty or more than three hundred dollars for .■each and every month he so fails to comply therewith, the amounts so forfeited to be recovered in the name of and for *221 the use of such city or village iu an action in the police court or other competent tribunal; such owner or agent foi owner may also be held for- civil damages to the party injured.”
It is contended by plaintiff in error: 1. That the "defendant in error, being a tenant of the second story, was not a person for whose protection, or in whose favor any duty prescribed by the statute was created. 2. That no-civil liability could attach to the owner - in this case under the statute, because it was not averred or proven that any notice had been given by the mayor as provided in section 2574. And 3. That the evidence did not tend to show that the building in question was a tenement house.
1. Are the benefits of this act confined to tenants occupying stories above the second story?.
The statute applies to all buildings included within the description which are more than two stories high. It requires the owners to provide a convenient exit from the different upper stories. The term “upper” implies a story above the ground floor. This is the dictionary meaning, as will be seen by reference to the Century Dictionary, and it is the natural meaning. Unless qualified by other portions • of the act, it would follow from this language that the owner is required to provide exit as well for the accommo-'-dation of those occupying the second story as for those in the higher stories. It is insisted that it is so qualified by the fact that the act can apply to no building except it be of ' more than two stories, and hence it follows that the legislature did not regard the danger incident to an escape from the second floor sufficient to require any interference on its part.
This proposition would have force if the number of people likely to need means of escape in a building of three or more stories would not be greater than in a two story building. But it must be manifest that the crowding of means of exit adds to the dangers, and that a provision as to - exits which would safely accommodate the occupants of the second story of a two-story building might prove entirely inadequate where the number was increased by the occupants . *222 of the stories above. Then, too; it is of significance that the ongiiial? act,'passed'May 5, 1877 (74 Ohio T. 176), “to require inn and boarding house keepers to provide suitable and efficient fire escapes,” did not confine the duty to buildings of more than two stories.. The dut3^ attatched to all owners or keepers of inns, etc.,' and the requirement was “to provide suitable and efficient ladders or other safe fire escapes from' the 'different upper stories,” etc. The latter act confines the duty to buildings of more than two stories, but the requirement is, as before, that the exits shall be “from the different upper stories of said building;” and it further requires that keepers of inns and public houses, where travelers or boarders are lodged in any story above the second story, “shall also provide a good rope or other life-line for each sleeping-room for guests in such stories.” Quite'clearly the restriction in the latter act is on the building to which it applies, and not upon the fire escapes or exits to be provided.
It does not follow that the exits for the benefit of occupants of the second, or any, story, in order to be “convenient” and “easily accessible in case of fire,” must necessarily be built to the ground. Manifestly what would be “convenient” as to a first story ten feet in height, might not prove so if the story were eighteen feet in height, and that which would be “convenient” where the way was clear and the ground underneath free from obstructions, would not be so if wires, or other obstacles were below it so as to prevent safe descent, or the space beneath occupied by railings, or area steps, or other things of like nature, dangerous to light upon. What would be proper and “ convenient” would have to be detemined by the circumstances of each case. We think the act was intended for the benefit of the occupants of all upper stories, in two-story, as well as higher buildings.
2. As to the second proposition it is contended that there can arise civil liability for damage only upon the sanie conditions, which would make the owner liable criminally, because the express provision of section 2574, that the owner who fails for sixty days after notice by the public officer re provide exits or fire escapes shall be liable to the public ..or *223 a penalty, and to the individual by way of civil damages, is an express declaration of the legislative intention as to the circumstances under which an owner shall become liable to the individual as well as to the public, and the legislature having made such declaration is a negation of liability upon the part of the owner, as well to the individual as to the public under any other circumstances.
In support of this claim the principle laid down in Commissioners v. Bank, 32 Ohio St., 194, is invoked, viz: that “Where a statute creates a new offence by prohibiting and making unlawful anything which was lawful before, and provides a specific remedy against such new offence, (not ante-cedently unlawful) by a particular sanction and method of proceeding, that method of proceeding, and none other, must be preserved.” The statute under consideration, and concerning which the above rule was announced, made it a crime for a county treasurer, having the safe keeping of public moneys, to “ convert the same to the use of himself or any other person or party, or to invest or loan the same;” or if any person shall advise, aid, or in any manner participate in such act, he, as well as the public officer, shall be held in law to be guilty of embezzlement of the moneys so loaned, invested or converted; and upon prosecution they shall be imprisoned, etc., and be fined equal to double the amount of the money or property so embezzled, which fine shall operate as a judgment at law, etc., for the use only of the party or parties whose moneys o.r other property has been so embezzled. The suit was a civil action against the bank to which the treasurer had loaned the public money, and-the court held that the statutory remedy of fine, etc., which was for the use only of the owner of the money, was exclusive, and the civil action could not therefore be maintained.
There are wide differences between the statute last referred to and the one under consideration. The embezzlement statute not only created an entirely new offence, making that criminal which before was not so,, but it provided also, that the fine should be for the benefit only of the person injured. In giving construction to such a law, a court might *224 well bold that, all civil remedies depend upon a conviction of the criminal offence created. The fine was to inure' to the injured party. It was part and parcel of the punishment. The remedy grew out of the criminal act, so to speak, and its enforcement was wholly dependent upon the proof of facts which established the criminal liability of the defendant, and it would follow as a corollary that the injured party could not have a remedy outside the special statute. Not so with the statute governing this case. The fine is wholly for the benefit of the municipality; the civil damages wholly for the benefit of the person injured. Nor was civil liability on the part of the owner first created by the language in section 2574— “suc'h owner or agent for owner may also be held for civil damages to the' party injured. ” Such liability followed as a consequence of the terms of the original act in which the language above quoted does not appear, but which enjoined the duty, and resulted from the principle, which we supposed to be of universal application, that where a statute imposes a duty but gives no penalty to the party aggrieved by its non-performance, that party is entitled, on common law principles, to maintain an action for his damages. The rule is stated more at length in Wharton on Negligence, section 448: “Where a statute requires an act to be done or abstained from by one person for the benefit of another, then an action lies in the latter’s favor against the former for neglect in such an act or abstinence, even though the statute gives no special remedy. In such cases applies the maxim Ubi jus ibi remedium. Even the imposition of a penalty by the statute does not oust the remedy by indictment, nor, a fortiori, by suit for negligence, unless the penalty be given to the party injured in satisfaction for injury.” It is stated in somewhat more guarded language, by Judge Cooley in his work on Torts, thus: “Where the statute imposes a new duty where none existed before,' and gives a specific remedy for its violation, the presumption is that this remedy was meant to be exclusive, and the party complaining of a breach is confined to it. So, if performance of the duty is enjoined under penalty, a recovery of this penalty is in general the only remedy, even *225 when it is not made payable to the party injured; but the rule is not without its exceptions; for if- a plain duty is imposed for the benefit of individuals, and the penalty is obviously inadequate to compel performance, the implication will be strong, if not conclusive, that the penalty was meant to be cumulative to such remedy as the common law gives when a duty owing to an individual is neglected. And if the duty imposed is obviously meant to be a duty to the public and also to individuals, and the penalty is made payable to the state, or to an informer, the right of an individuál injured to maintain an action on the case for a breach of the duty owing to him will be unquestionable.” For furthnr application of the principle, see Couch v. Steel, 77 Eng. C. E. Rep. 402; Jetter v. Railroad, 2 Abb. App. (N. Y.) 458; Messenger v. Pate 42 Ia. 444; Siemers v. Eisen, 54 Cal. 418; Willis v. Mulledy, 78 N. Y. 310; Parker v. Barnard, 135 Mass. 116.
It is insisted that these sections apply to the designated buildings located within' 'municipal corporations, from which it follows that they are intended primarily as police regulations, and only incidentally, for the benefit of particular tenants, and that this is shown by their location in the Revised Statutes, being under the general heading “Municipal Corporations.” We think it a sufficient answer to this claim that the first act, the title of which has been already quoted, was not passed as an amendment to, or part of, the municipal code, though such a code had been a distinct part of the statute for eight years, but was enacted as an independent statute. By its terms, as already stated, it applied to all owners, etc. True, the second and third sections named certain officers whose duty it was to enforce the act in municipalities. But this did not absolve those coming within its description, though they lived outside of municipalities, from obeying its requirements. The fine was not for the purpose of raising revenue, but to enforce compliance, and was an incident to the main features of the act, rather than a primary object. Had the duty imposed upon owners been such as tended to prevent the danger of communicating fire from one building to another, or to the lia *226 bility of a building to catch fire and thus endanger adjpining structures, there would be ground for saying that the legislation was in the nature of a police regulation. But no feature of this kind appears.
Subsequent legislation is in the same line. The act of April 4, 1884, supplementing section 2573 (81 Ohio Raws,. 106), is entitled an act “for the better protection of the health, comfort, and safety of persons employed in shops and factories.” It creates the office of inspector of shops and factories, and, among other duties, imposes that of examining as to the means of exit in case of fire or other disaster, and prescribes a penalty for a failure to comply with his instructions. We think that the language of the act in question, interpreted in the light of the history of the entire legislation upon the subject, leads to the inevitable conclusion that the act was primarily for the benefit and protection of dwellers in the buildings déscribéd, wh'erever located; it is, as to them, remedial in its nature, and should receive such construction as will avoid the. mischief and advance the remedy. The orignal act, it is true, did not include tenement houses, by name, but that can make no-difference when the inquiry is as to the scope of the act in other respects. No reason has been suggested, and, it is submitted, none exists, for protecting persons in workshops, or factories, or public houses, situated within municipalities, which does not apply as well to those without. That the class within is larger in number than the class without, certainly does not afford such reason. Nor can the fact of location in order in the Revised Statutes negative the presumption to be drawn from the language of the act and its title. Arrangement of the statutes under their respective heads, was primarily the work of the codifiers to conserve convenience merely, and its adoption by the legislature afterwards, could not be accepted as an intent to defeat a purpose manifested in the law at the time o.f its enactment. We take the sections as we find them. Their manifest purpose is for the protection of life and limb, and they should not be shorn, by construction, of their remedial features because a penalty, payable only to the municipalitj-, *227 is attached to violation after' notice. To make the liability of the negligent owner to the injured, though innocent tenant, depend irpon the action, or non-action, of a municipal officer, over whom the tenant could have no control, and possibly no influence, would be to take from the statute one of its most important and beneficial features, and to greatly retard the humane purpose intended.
3. Was the building of plaintiff in error one of those included within the terms of the statute? In other words, does the testimony "tend to show that it was a tenement house?
The word “tenement” in-Abbott’s Raw Dictionary, is defined thus: “In modern times, and very frequently in public usage, it denotes simply a house; e. g. in the phrase, ‘ all that messuage or tenement.’ From its apparent analogy to tenancy and tenant, it is popularly used for a building, or distinct portion of a building; particularly adapted to be let for short periods and at moderate rent.” Anderson’s Raw Dictionary gives it: “In modern use, a room let in a house, or such part of a house as is separately occupied by a single family or person, in contradistinction to the whole house.” In Young v. Boston, 104 Mass., 95, it is held the word “tenement” in the Massachusetts Statutes, “is obviously used to describe such part of the house as is separately occupied by a single family, in contradistinction from the whole house.” A “tenement house,” as defined in the Century Dictionary, is “a house or block of buildings divided into dwellings occupied by separate families.” ' The Pennsylvania Statute defines tenement houses as “ every tenement house or building in which rooms or floors are usually let to lodgers or families.”
In the light of these citations, we see no reason to question the sufficiency of the definition of the word “tenement house,” contended for by counsel for defendant in error, tó-wit: “ A building, the different rooms or parts of which are let for residence purposes by the possessor, to others, as distinct tenements, so that each tenent, as to the room or ' rooms occupied by him would sustain to the common land *228 lord the same relation that the-tenent occupying- a-whole house, would to his landlord.”
Now, the evidence tended to show that the building was a four story building; that on the second floor, in separate suites of rooms, lived three families composed of ten persons ; on the third floor, in separate suites of rooms, two families numbering six persons, in all five families, composed of sixteen persons. Witnesses testified concerning their bedrooms, and kitchens, and to the fact of living in their respective apartments, and of occupying them as tenents. What more could be required to show that the building was-a “tenement house,” we are at a loss to conjecture.
Exceptions were taken to the admission of evidence. Also, to the charge as given upon, points not hereinbefore noticed, and to refusals to charge. The questions thus raised do not appear to be of such general interest .as to make it worth while to lengthen this report by a statement and a discussion of .them. Upon the whole case the trial seems to have been fairly conducted. The-charge-was as--favorable to the complaining party, in the respects above alluded to, as he could reasonably ask, and the requests not given, were,, as we think, properly refused.

Judgment affirmed.